Filed 3/20/25; Certified for Publication 4/16/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel. HYDEE FELDSTEIN SOTO, as City Attorney, etc., <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> GROUP IX BP PROPERTIES, LP, et al., <br><br>     Defendants and Appellants. | B337891 <br><br> (Los Angeles County Super. Ct. No. 22STCV05624) |

    APPEAL from an order of the Superior Court of Los Angeles County, Holly J. Fujie, Judge. Affirmed.

    Hydee Feldstein Soto, City Attorney; Michael J. Bostrom, Senior Assistant City Attorney; and Jonathan H. Eisenman, Deputy City Attorney for Plaintiff and Respondent.

    LARSON, Stephen G. Larson, Jerry A. Behnke, Daniel R. Lahana, and Mehrunisa Ranjha for Defendants and Appellants.

# INTRODUCTION

Assembly Bill No. 1418 (AB 1418), codified at Government Code[1] section 53165.1, became effective January 1, 2024. Section 53165.1, subdivision (b) bars "local government[s]" from "promulgat[ing], enforc[ing] or implement[ing]" an "ordinance, rule, policy, program, or regulation" that penalizes tenants or their landlords "solely as a consequence of contact with a law enforcement agency." The primary purpose of section 53165.1, according to the bill's author, is to bar local "crime-free housing ordinances" that prohibit landlords from renting to prospective tenants with criminal histories, including arrests without conviction, regardless of the risk to the safety of the property or other tenants.

This appeal raises a single issue. Here, a landlord argues that a case brought on behalf of the People of the State of California by the Los Angeles City Attorney to enforce the state's Public Nuisance Law (Civ. Code, § 3479 et seq.) (PNL) violates section 53165.1. This is so, says the landlord, because the evidence in the nuisance case is based in significant part on police reports that identified ongoing criminal activity at the landlord's property.

We disagree with the landlord. Enforcing the PNL is not prohibited by section 53615.1. The PNL is a state law. Enforcing it is enforcing a state law. It is not enforcement of an "ordinance, rule, policy, program, or regulation," which is what section 53165.1 requires. Nor is an action, like this one, brought by a city attorney on behalf of the People of the State of California to

_____

[1]    All further undesignated statutory references are to the Government Code.

enforce the PNL, properly construed as an action by a "local government" within the meaning of section 53615.1. And, in any event, section 53165.1 does not apply merely because some or all of the *evidence* concerning an underlying nuisance consists of police reports documenting criminal activities. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

We limit our recitation of the facts to those necessary to provide context for the narrow issue we are deciding in this appeal.

"The People of the State of California, acting by and through the City of Los Angeles (the People), allege that a gang-related public nuisance exists at a 116-unit apartment complex in North Hollywood, commonly known as the Vanowen Apartments. Defendants and appellants Group IX BP Properties, LP, Group IX BP Properties, Inc., Regency Management, Inc., PAMA Management, Inc., and Golden Management Services Inc. (collectively, defendants) own and manage the property." (*People v. Group IX BP Properties, LP* (Jan. 18, 2024, B322878) [nonpub. opn.] (*Group IX*).)

In February 2022, the People filed a complaint alleging defendants have owned, operated, and managed the property in a manner that creates a public nuisance (Civ. Code, § 3479 et seq.) and violates the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL). (*Group IX, supra*, B322878.) The sole basis for the UCL claim is an allegation that defendants also violated the UCL as a derivative result of their violation of the PNL.

"The complaint alleges the 'public nuisance consists of, but is not limited to, the regular, menacing, intimidating, violent, and

3

disorderly presence of resident and non-resident gang members and/or associates at the [p]roperty; the occurrence of gunfire on the [p]roperty, including gunfire that has resulted in injury and death to persons and damage to property on and around the [p]roperty; the occurrence of robberies and other crimes that take place on or emanate from the [p]roperty; the occurrence of gang members and/or associates setting off fireworks, playing loud music, double parking, and blocking driveways at the [p]roperty; and the tendency of the [p]roperty to attract gunfire from rival gangs because of the historical and current presence of gang members at the [p]roperty.'" (*Group IX, supra*, B322878.) As remedies for defendants' alleged mismanagement of the property, the People sought abatement of the alleged public nuisance, a permanent injunction, and civil penalties. (*Ibid.*)

In April 2022, the People moved for a preliminary injunction supported by declarations of several Los Angeles Police Department officers, a property management expert, and two community members, along with over 100 police reports of incidents on the property or in the area. (*Group IX, supra*, B322878.) After a hearing on the motion, the trial court granted the People's motion in part. (*Ibid.*) "[T]he court ordered defendants to implement several security measures, including but not limited to, the following: 'the [p]roperty must be properly closed off to the public'; gates must operate through 'some type of electronically controllable and trackable system such as a keypad that can store information about the person accessing the [p]roperty'; there must be 'proper lighting of all public areas, including the parking lot, courtyards, and laundry room'; the property must have a 'proper, operating web-based video camera monitoring system with a high-resolution, internet-connected,

4

remotely viewable video monitoring system that allows management to monitor the property and remove trespassing gang members'; defendants 'must assign parking spaces to tenants and issue serialized hangtags'; defendants must employ private security with an active license and '[a]t least four trained security officers must be present at the [p]roperty seven days a week during the hours of darkness throughout the year'; and a resident property manager must be on duty and on the property during all regular business hours." (*Ibid.*, fn. omitted)  The court further ordered defendants to perform criminal background checks on, and not rent to, certain tenants and prospective tenants.

Defendants appealed from the preliminary injunction order entered on August 12, 2022.  On January 18, 2024, a different panel of this court affirmed the order in *Group IX, supra,* B322878.  Although they had not raised the issue in the trial court, defendants asked the panel on that appeal to dismiss the injunction in light of section 53165.1, which became effective January 1, 2024.  (*Ibid.*)  Without addressing the issue in the first instance, the panel further directed the trial court, on remand, to consider, after briefing and argument, whether any of the terms of the preliminary injunction must be modified in light of section 53165.1.  (*Ibid.*)

On remand, the parties submitted briefs to the trial court regarding the applicability of section 53165.1.  Without conceding the applicability of section 53165.1, the People proposed the injunction be modified to remove the requirements that defendants conduct background checks on prospective tenants and evict tenants engaged in certain kinds of illegal activity (i.e., paragraphs 21, 24, and 25).  They explained: "Although [s]ection

5

53165.1 does not directly impact this case, it does signal a general public policy disfavoring mandatory tenant background checks and evictions based on arrests (with some exceptions)."

After a hearing, the trial court modified the injunction as proposed by the People. It otherwise "confirmed" the "validity of the [p]reliminary [i]njunction[.]" The trial court reasoned: "[The People's] mere use of law enforcement contacts as evidence to support [their] claims that [d]efendants' conduct violated state laws does not warrant either that the [c]ourt vacate the [p]reliminary [i]njunction in its entirety or that it dismiss this case . . . ."

Defendants timely appealed.[2]

## DISCUSSION

"Ordinarily we review [preliminary injunction] orders for an abuse of discretion, but where, as here, the issue is purely one of law, our standard of review is de novo." (*City and County of San Francisco v. Post* (2018) 22 Cal.App.5th 121, 129.)

_____

2      We reject the People's argument that the appeal should be dismissed because defendants were not aggrieved by the trial court's ruling and, therefore, lack standing to bring this appeal. The trial court struck certain terms from the preliminary injunction, but refused to dissolve the preliminary injunction in its entirety or dismiss the case. Defendants' appeal from the modified preliminary injunction is proper. (See, e.g. *Soldate v. Fidelity National Financial, Inc.* (1998) 62 Cal.App.4th 1069, 1073 ["Where a ruling is partially, but not completely, favorable, the party may appeal from the unfavorable part of the judgment"]; see also Civ. Proc. Code, § 904.1, subd. (a)(6) [an appeal may be taken "[f]rom an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction"].)

6

Section 53165.1, subdivision (b)(1), provides: "A local government shall not promulgate, enforce, or implement an ordinance, rule, policy, program, or regulation affecting a tenancy that does any of the following: [¶] (1) Imposes or threatens to impose a penalty against a resident, owner, tenant, landlord, or other person solely as a consequence of contact with a law enforcement agency."

When interpreting statutory language, our fundamental task is to "'"'"'determine the Legislature's intent so as to effectuate the law's purpose.'"'"'" (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) "'"'"'We first examine the statutory language, giving it a plain and commonsense meaning. . . .'"'"'" (*Ibid.*) "If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction." (*City of Alameda v. Sheehan* (2024) 105 Cal.App.5th 68, 75.) "But '[e]ven where the plain language of the statute dictates the result, the legislative history may provide additional authority confirming the court's interpretation of the statute.'" (*Ibid.*) Finally, "'"[w]e do not . . . consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes . . . . We must harmonize the various parts of the enactments by considering them in the context of the statutory [framework] as a whole."'" (*Turrieta v. Lyft, Inc.* (2024) 16 Cal.5th 664, 687.)

Defendants' argument that this action is barred by section 53165.1 fails at the outset. This case unambiguously does not involve enforcement of an "ordinance, rule, policy, program, or regulation" within the meaning of the statute. Here, the first cause of action alleges a direct violation of the PNL. The second alleges a derivative violation of the UCL based solely on a

7

violation of the PNL.[3]  The PNL is a state law enacted by the Legislature.  Similarly, using the UCL to enforce the PNL is enforcing state law.  Neither cause of action seeks to enforce an "ordinance, rule, policy, program, or regulation."  (§ 53165.1, subd. (b).)

It is very unlikely that the Legislature intended to apply section 53165.1 to the enforcement of statewide law.  The prohibition on enforcement uses the words "ordinance" "rule" "policy" "program" and "procedure."  It nowhere uses the word "law."  Nowhere in section 53165.1 is there an express prohibition on enforcing state law.

Unsurprisingly, throughout the Government Code, ordinances, rules, policies, programs, and regulations are commonly defined as matters for local or administrative governance that are distinct from statewide law and legislative enactments—even if they may be enforceable to the extent of the powers of a local jurisdiction.  (See, e.g., §§ 36900-36904 [discussing the powers of cities to enact local ordinances]; §§ 25120-25132 [discussing the power of counties to enact local ordinances]; § 18212 [discussing definitions of "rule" and "regulation" as distinct from state law]; § 53202.2 [discussing local "rules, regulations and procedures" as distinct from state law]; §§ 54202, 54203 [discussing local agency "policies" and procedures as distinct from state law]; § 25715 [expressly distinguishing between "policies" and "statutes"]; § 53705 [discussing local "programs" operated by cities and counties,

_____

3        "[Business and Professions Code] section 17200 'borrows' violations from other laws by making them independently actionable as unfair competitive practices."  (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143.)

distinct from state law].)  The California Constitution makes a similar distinction.  (Cal. Const., art. XI, § 7 ["A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].)  And so does caselaw. (See, e.g., *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149-1150 [distinguishing between generally-applicable state law and local ""ordinances and regulations""].)  We are aware of no California case or statute that has applied a ban on enforcing an "ordinance, rule, policy, program, or regulation" to an enforcement of state law enacted by the Legislature.  Defendants do not suggest any examples.

It is true that section 53165.1 defines the "penalty" that an "ordinance, rule, policy, program, or regulation" enforced by a local government may not impose as including, among other things, "[a]n actual or threatened nuisance action."  (§ 53165.1, subd. (a)(3)(F).)  But, in order to be prohibited by section 53165.1, that "penalty" still must be based on an "ordinance, rule, policy, program, or regulation."  (§ 53165.1, subd. (b).)  And, again, nothing indicates that enforcement of a state law enacted by the Legislature, including the PNL, is enforcement of an "ordinance, rule, policy, program, or regulation."  Rather, subdivision (a)(3)(F) appears to contemplate a nuisance action brought under a local ordinance.

Moreover, section 53165.1 itself uses distinct language for "state law" and an "ordinance, rule, policy, program or regulation[.]"  (See § 53165.1, subd. (c)(2) ["This section does not prohibit a local government from promulgating, enforcing, or implementing an ordinance, rule, policy, program, or regulation that is otherwise consistent with state law"].)  This subdivision

9

suggests explicitly that the statute is *not* intended to prevent local governments from taking actions consistent with existing state law. Accordingly, taken as a whole, the language of the statute and principles of statutory construction make clear that section 53165.1 simply does not apply to actions brought to enforce state law, including the PNL.

Defendants' argument that this action involves the enforcement of a city program or policy within the meaning of section 53165.1 is also without merit. Defendants argue this action was brought pursuant to the Citywide Nuisance Abatement Program (CNAP)—a "multi-agency task force." Their argument is based on the caption page of the complaint. The complaint, under the list of names of the attorneys representing the People, states: "Office of the Los Angeles City Attorney" and "Citywide Nuisance Abatement Program[.]" (Capitalization omitted.) The CNAP, a group of city agencies, is not a "program" that can be enforced at all—and, in any event, this action does not seek to "promulgate, enforce, or implement" that "program." (See § 53165.1, subd. (a)(4) ["'Program' means a voluntary or mandatory initiative operated or endorsed by a local government or a law enforcement agency"].) Rather, the city, working with the CNAP task force brought this action against defendants on behalf of the state to enforce state laws, the PNL and UCL.[4]

We also conclude that the action before us is not an enforcement action by a "local government" within the meaning of section 53165.1. Under the PNL, "[a] civil action may be

---

4 Other than this lawsuit, defendants do not point to any voluntary or mandatory initiative promulgated or implemented by CNAP to penalize landlords or tenants as a consequence of contact with a law enforcement agency.

brought in the name *of the people of the State of California* to abate a public nuisance . . . by the city attorney of any town or city in which the nuisance exists." (Code Civ. Proc., § 731, italics added.) In such a public nuisance action, the city attorney acts as the prosecuting agency representing the interests of the People of the State, not the local governmental entity. (*Ibid.*; see § 100, subd. (a) ["[t]he sovereignty of the state resides in the people thereof"].) The City of Los Angeles is certainly a local government. But just because the Los Angeles City Attorneys' Office represents (i.e., is acting as the attorney for) the People of the State of California in this lawsuit, based upon a special provision of state law that allows it to do so, does not mean that the prosecuting party is anything other than the People of the State of California.

Defendants cite a number of cases that discuss the scope of the authority of local governments to enforce state law beyond a local jurisdiction's boundaries, the preclusive impact of such a representation, and/or the agency-law implications of a representation of the People of the State of California by a local city attorney's office. (*People v. City of Los Angeles* (1958) 160 Cal.App.2d 494, 500; *City of Oakland v. Brock* (1937) 8 Cal.2d 639, 641; *California v. M &P* Investments (E.D. Cal. 2002) 213 F. Supp.2d 1208, 1214.) We do not find these cases instructive on the issues here. Whatever the metes and bounds or preclusive effect of a local government's representation of the People of the State of California (matters on which we do not comment), the prosecuting party in the action before us is unquestionably the "People of the State of California," not a local government. Based on the statutory language discussed above, we cannot conclude that the Legislature intended to bring an action prosecuted on

11

behalf of the People of the State of California within the ambit of section 53165.1.

Accordingly, this is not an enforcement action by a "local government" for purposes of section 53165.1.

Finally, even if section 53165.1 applied to this action, the preliminary injunction does not penalize tenants or their landlords "solely as a consequence of contact with a law enforcement agency." (§ 53165.1, subd. (b)(1).) As discussed in *Group IX*, the basis for the People's lawsuit is defendants' mismanagement of the property, which has allegedly caused a gang-related public nuisance. (*Group IX, supra*, B322878.) Thus, the People seek remedies for defendants' alleged failure to maintain the property, not defendants' contacts with law enforcement. Nothing in the statute supports defendants' argument that the People's submission of police reports as *evidence* of their claim of a public nuisance turns this action into one that penalizes landlords and tenants "solely as a consequence of contact with a law enforcement agency." (§ 53165.1, subd. (b)(1); *Rallo v. O'Brian* (2020) 52 Cal.App.5th 997, 1011, fn. 12 ["'solely'" means "'to the exclusion of all else'" and is synonymous with "'only'"].) For this additional and independent reason, we conclude the trial court did not err by declining to dismiss the case and confirming the validity of the modified preliminary injunction.

Having found no ambiguity in section 53165.1, "we need not refer to extrinsic sources." (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089.) However, we briefly note that AB 1418's history confirms our interpretation.

As stated in the bill's synopsis, AB 1418 aims to "modestly expand" existing law, which prohibits local governments from

adopting policies to penalize landlords or tenants "as a consequence of law enforcement assistance or emergency assistance being summoned by, or on behalf of, a victim of abuse, a victim of crime, or an individual in an emergency." (Assem. Com. on Judiciary, Analysis of Assem Bill No. 1418 (2023-2024 Reg. Sess., April 11, 2023 (italics omitted); § 53165, subd. (b).) The author of AB 1418 noted the types of housing policies that generally fall within the ambit of section 53165.1 "take two forms": "'crime-free' ordinances, which impose mandatory requirements" and "ostensibly voluntary 'crime-free' programs" that landlords are pressured into joining. (Sen. Com. on Judiciary, Hearing on Assem Bill No. 1418 (2023-2024 Reg. Sess.), July 6, 2023.) AB 1418's author explained: "Under the authority of crime-free housing ordinances, landlords are instructed or encouraged to refuse to rent to prospective tenants with a criminal history, including a history of arrests without conviction, regardless of whether that record suggests a present risk to the rental property or the safety of other tenants." The author relied on studies suggesting that there was little or no evidence that such policies had an impact on crime rates, but significant evidence that they had other negative social impacts, such as reducing housing opportunity for historically marginalized communities.

The author specifically stated that the bill was *not* intended to preclude the enforcement of statewide law. He noted that "a local measure regarding criminal conduct on or near property could be adopted if it complied with state law" and that the bill was intended to "[c]larify the prohibition on a local measure that imposes a penalty because of contact with law enforcement and

13

nuisance ordinances that are *inconsistent with existing law*." (Italics added.)

Accordingly, the legislative history demonstrates that section 53165.1 is intended to prohibit "crime-free housing" ordinances and policies based on the Legislature's belief that those policies are ineffective at reducing crime and harmful to communities. It is not intended to prohibit enforcement of statewide nuisance law. That is so even when the evidence of an underlying nuisance consists of police reports documenting criminal activity.

## DISPOSITION

The order is affirmed. The People are awarded their costs on appeal.

DAUM, J.[5]

We concur:

ZUKIN, Acting P. J.

COLLINS, J.

5    Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article IV, section 6 of the California Constitution.

Filed 4/16/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT
DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel. HYDEE FELDSTEIN SOTO, as City Attorney, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> GROUP IX BP PROPERTIES, LP, et al., <br><br> Defendants and Appellants. | B337891 <br><br> (Los Angeles County Super. Ct. No. 22STCV05624) <br><br> ORDER GRANTING PUBLICATION REQUEST |

THE COURT:*

The opinion in the above-entitled matter, filed on March 20, 2025, was not certified for publication in the Official Reports. We now conclude that the opinion should be certified for publication in its entirety in the Official Reports and it is so ordered.

There is no change in judgment.

DAUM, J.*          ZUKIN, Acting P.J.          COLLINS, J.

_____

* Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article IV, section 6 of the California Constitution.